LAND, J.
The following statements are taken from plaintiff’s brief:
“J. A. Callery has institued this action in the district court of the parish of Iberia, to recover damages arising from the destruction of his automobile and injuries occasioned to his person by a train of the defendant company. From a judgment rendered in favor, of plaintiff in the sum of $1,900, the defendant has appealed, and the plaintiff has asked for an amendment of the judgment so as to allow him damages in the sum of $3,500.”
“In this case, the contention of the plaintiff is that he was approaching a blind crossing; that, before he reached the crossing, he stopped, looked, and listened, heard no train approaching, and proceeded across, when he was struck by a train being backed from his left, which consisted of an engine, with a tender in front, and four box cars attached. The answer is that the defendant gave all legal warnings, did everything in its power to avoid the accident; that the accident occurred through the carelessness of the plaintiff, and consequently it pleads contributory negligence.”
Defendant says in its brief:
“The issues in the case are those arising from plaintiff’s attempting to cross a railroad spur *766 track in an auto at considerable speed, without either stopping, looking, or listening, with his body leaning forward, his head down, his hand on the speed clutches, and his attention riveted thereon, while the defendant’s train was backing over the crossing with the engine and tender forward, and at the rate of possibly four miles or less.”
Plaintiff’s statement discloses that the train and the auto were approaching, at the same time, a street crossing, at a point where the view was obstructed by a house and trees. Such a situation demanded more than ordinary care on the part of the plaintiff and of the train crew in approaching the crossing.
The petition alleges that the plaintiff stopped his car at a distance of 60 or 70 feet from the spur track, and, not seeing any flagman at the crossing or hearing a train approaching, drove his automobile upon said crossing, when the engine and cars ran down upon him, without signals or warnings of any description.
According to plaintiff’s testimony, he stopped his car at Bergeron’s blacksmith shop to have some minor work done on the machinery, and, after the car was delivered to him, got in the car and looked ahead, and did not see or hear anything; he then started the car on first speed, and drove off, and reached the railroad crossing. In answer to the question what occurred after he reached it, the witness answered:
“That is all I remember. I must have been changing the gear.”
And in answer to the further question, what then occurred, the witness replied:
“The locomotive tender hit me.”
Plaintiff further testified that the distance between the point he started the car and the point where he was hit was, he supposed, about 100 feet; that he was driving about 5 or 6 miles an hour, did not see or hear anything, did not see anybody at the crossing, or hear any bell rung or whistle blown; that, after starting his car, he never stopped at all until the engine stopped him.
On recross-examination, the plaintiff was asked the following question:
“Now, please tell me what you remember happening from the time you got in your auto until you were struck.”
To which he replied:
“I got in the auto and started off, and when I got 50 or 70 feet I was in the manner of shifting gears, and whether I finished doing it or not I don’t remember; that is all I remember.”
In answer to another question, the plaintiff stated:
“After that, the collision took place, but it was so sudden.”
Plaintiff testified in substance that, in changing the gearing, he had to lean over and look down, and would have had to look up to throw on the power. As the witness stated repeatedly that he did not remember whether he had finished shifting gears when the collision took place, he certainly could not remember looking up and around after the gears had been shifted.
Boiled down, the plaintiff’s testimony shows that he got in his car, started off, commenced shifting the gearing of his auto, and was so engaged when the collision took place.
Mr. Bergeron testified as to plaintiff’s actions, after his auto was fixed, as follows:
“He started off down the street, and he went, I suppose, I guess about halfway from where I was to the railroad, about 50 or 60 feet, and aimed to shift on the second gear, and, just a little while after he did that, I think he had it in the second gear, and, just as I looked down, the train backed out and he was about the same distance from the track as the train was from the center, and they hit right in the center.”
The same witness testified that a man, who was standing on the step of the tender, had to jump to save himself. The same witness testified that plaintiff started his machine from a point about 200 feet, or a little more than 100 feet, from the railroad track; that plaintiff was leaning over putting on the second speed, and did not raise up until he was about 15 or 20 feet from the track; that wit *768 ness would, not say that plaintiff tried to stop, and in fact did not stop at all.
The same witness testified that, on account of trees and bushes, it was impossible for a person to see down the railroad track until within a few feet of it. He further stated that the crew did not stop the train, which got off the track and pushed the auto against a gate and destroyed the machine. The witness first stated that the crew did not attempt to stop the train. This witness heard no bell, whistle, or noise indicating the approach of the train.
Vittur testified that he was present when the plaintiff in his auto left Bergeron’s shop on the occasion in question, and described what happened as follows:
“Just as he got his front wheels on the track, I seen the tender behind the engine poke out and just as he got about halfway of the track they run into him, and the switchman on the end of the tender jumped off.”
The witness explained then the engine “poked out from behind the fence,” or, in •other words, after it got out of the alley and into the street. Vittur told in effect the same story as Bergeron about the destruction of the machine, and also did not hear any warnings of the approach of the train.
Babin, a workman, testified that he was at Bergeron’s shop on the occasion in question, and that plaintiff started off and went about 26 or 30 feet straight and then shifted on the second gear, and, by the time he got to the track, witness noticed the locomotive coming down there, and that is where it struck him. The witness explained that he saw the tender backing out of the alley, when it was about 16 steps or 46 feet from the car. Babin corroborated the other witnesses as to the destruction of the auto and the absence of warnings. But the witness differed from the plaintiff and Bergeron as to the visibility of the train from the point whence the car started. He testified he saw the tender passing the house in front of the railroad track, and that probably plaiptiff could have seen it.
Mr. Lockwood, civil engineer, called by defendant, testified that he placed a man on the railroad track approximately 50 feet from the center of Church street in the direction of Main street, and then went on Church street in the direction of Bergeron’s shop to the farthest point from which he could see this man, and found the distance to be approximately 200 feet. It needed no witness to prove that, under like conditions, a locomotive tender is much more visible than a man on the track. The same witness testified that average locomotive tenders are about 10 feet high and 18 feet long.
The cross-examination of the civil engineer resulted in some changes in his figures, which, however, make no material difference in the decision of the question of negligence vel non. The more difficult it was for plaintiff to see the approaching train, the more imperative was his duty to" stop, look, and listen before attempting to cross the railroad track.
Whitworth, witness for defense, in his garden about 100 feet from the track, heard the train coming, the ringing of the bell, the blowing of the whistle, and the shutting off of the steam at Church street. Leo Frank, while eating supper in his dining room, about 60 feet from Church street, heard the same noises, and about one minute later the “commotion” in the street.
Elmer, the engineer, testified that the bell was rung, and the whistle repeatedly sounded 40 feet from Church street, to warn the occupants of a vehicle which was approaching the track, and which was finally flagged down by the switchman, who had jumped from the footboard and run to the crossing for that purpose. Elmer further testified that the auto was not visible from his side, but when the fireman cried out, “Hold her! Hold her!” he put the air on, and the first *770 tie saw of the auto was when it was struck by the tender.
Bunt, the fireman, testified that he was at his post in the cab, keeping a lookout and ringing the bell, and that when the back end of the tender was about 15 or 20 feet, and he was about 40 or 45 feet, from the center of Church street, he saw an auto coming on his side, and the driver had one hand on the steering wheel and the other working on the side of the machine, and the witness cried out to the engineer, “Stop!” and he immediately applied the air. The witness further stated that he could not get a view of Church street towards the, Bergeron shop until he had cleared the house near the corner. The same witness corroborated the engineer as to the sounding of the whistle to attract the attention of some one on his side.
On cross-examination, the witness said that when he first saw the auto it was some 60 or 70 feet from the track, and that, on perceiving that the driver was looking down, he gave the engineer the signal to stop.
The flagman, Hebert, corroborated the testimony of the engineer and fireman as to the warning signals given, and further stated that, as the train was about entering Church street, he saw a little negro driving a vehicle and whipping his horse, as though he intended to beat the train across the track; and that thereupon the engineer sounded his whistle, and the witness jumped off the foot-board of the tender and ran to the crossing to stop the boy, who, however, stopped short of the track. The flagman further testified that on turning around he saw the auto coming at a pretty good gait, from 50 to 75 feet from the track, and he “hollered” at him and waved at him, flagged him down and tried to stop him, but the auto came on and got on the crossing the same time the engine did.
The foreman or conductor was seated in one of the box cars, but he heard the bell and whistles, and so testified. A brakeman on the fourth ear testified to the same effect.
[1] Plaintiff knew that he was approaching a railroad track, and his own testimony shows beyond question that he did not stop, but drove on blindly, until his auto was struck by the locomotive. Plaintiff did not even check his speSd, and, if he looked at all, it was too late to avoid the collision.
The rule that “one who reaches a railway crossing on a public highway is under the duty to stop, look, and listen,” has been recognized and enforced by this court in numerous cases. See Barnhill v. Texas & Pacific Ry. Co., 109 La. 43, 33 South. 63. In some courts this rule has been modified as to the duty to “stop,” but it has been properly held, we think, that the law exacts from the driver of an automobile a strict performance of the duty to stop, look, and listen before driving upon a railroad crossing, where the view is obstructed. See New York Cent. & H. R. R. Co. et al. v. Maidment, 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794. See, also, Bromer v. Penn. Ry. Co., 179 Fed. 577, 103 C. C. A. 135, 29 L. R. A. (N. S.) 924, a similar case to the one at bar.
[2] Conceding, for the sake of argument, that defendant’s trainmen were guilty of concurrent negligence in the premises, still the contributory negligence of the plaintiff debars recovery. Loftin v. R. R. Co., 135 La. 33, 64 South. 972. The last chance doctrine has no application when the negligence of both parties was concurrent and continuous, down to the moment of the accident. Wolf v. N. O. Ry. & Light Co., 133 La. 891, 63 South. 392; Castile v. O’Keefe, 138 La. 479, 70 South. 481.
It is therefore ordered that the verdict and judgment below be set aside; and it is now ordered that plaintiff’s suit be dismissed with costs in both courts.
MONROE, C. J., takes no part.