LAND, J.
This is an action sounding in damages. On the afternoon of October 31, 1918, plaintiff’s car, occupied by himself and his chauffeur, was wrécked at the corner of the lower side of Canal street and North Rendon street in the city of New Orleans, by collision with a Villere street car, owned and operated by defendant railway company. At the time of the accident, plaintiff was seated on the rear seat of the automobile, which was attempting to pass over the public crossing from the lower to the upper side of Canal street.
There are double tracks over this crossing; the outbound track being next to the lower side of Canal street, and the inbound track next to the upper side of Canal street. This collision took place on the outbound track, while plaintiff’s automobile was astride this track.
*437 The Villere car had come from the barn in block 365 on the lower side of Canal street, at the corner of White and Dnpre streets, and was on its way out towards the Cemeteries, to its regular route at Villere street. It was a small car, -with a hand brake, and had no passengers aboard. The accident occurred 4 blocks from the car barn, at the North Rendon street crossing. This block lies between North Lopez street and North Rendon street, and the testimony in this case relates to incidents happening in this block immediately before the accident. There were two automobiles in Canal street on its lower side in this block, when the Villere car entered the block on the outbound track. The Villere ear and these automobiles were all going in the same direction out towards the Cemeteries.
One of these automobiles was a Cole car, occupied by J. B. Ferchaud, Jr., and a Mr. Brown, who was driving the car. The other automobile was a Liberty Six sedan, occupied by John J. Gannon, the plaintiff, and his chauffeur. When this Cole car was about the middle of the block, J. B. Ferchaud, Jr., observed the Villere car, as it entered the block. The Cole car was traveling at the rate of from 12 to 15 miles per hour. The Gannon car had already passed the Cole car, and was on its way to the North Rendon street crossing. The testimony of J. B. Ferchaud, Jr., is to the effect that the accident occurred before the Cole car reached the scene of the collision. In other words, the Villere car had traversed the whole distance of the block, and had collided with the Gannon car, before the Cole car, which was in the middle of the block when the Villere car entered it, had reached the scene of the accident. The Villere car was traveling, therefore, at a rate of speed twice that of the Cole car, i. e., from 24 to 30 miles per hour. The testimony of J. B. Ferchaud, Jr., is corroborated by the physical facts connected with this collision, and clearly shows that the Villere car was operated at an excessive rate of speed at the time of the accident.
The impact of the onrushing street car was so great that it catapulted plaintiff’s machine up the car tracks a distance estimated at at least 50 feet. The chauffeur was hurled by the impact from his position at the wheel of the automobile, and was bruised about the body and his fingers dislocated. John J. Gannon, the plaintiff, who occupied a rear seat in his machine, had both hands cut from the shivered glass of his car, five ribs broken, and sustained also serious contusions of the head and bruises of the body. The violence of the blow from the collision broke two wheels, all of the running board, bent the chassis, and demolished the top of the Gannon car.
The Liberty Six sedan, in which the plaintiff was riding, was not merely pushed along1 the tracks by the speeding street car, but was struck one terrific blow, which had sufficient propulsion to drive this machine up the tracks to the place where it finally rested. The conductor and motorman of the Villere car were very careful in their testimony as to statements about the speed of this car. The motorman states that the car was operated at three-fourths speed, and that it was coasting. We are not informed by the record as to what rate of speed is attained by three-fourths speed. The conductor and motorman both testified that the Villere car slacked up to see if anybody was jumping off of the Spanish Fort train, which was approaching this crossing on the inbound track at the same time the Villere car was nearing it on the outbound track. They also swear that the hand brake and the reverse were both applied before the accident. Yet, as counterbalancing this testimony, we have a Liberty Six sedan, hurled 50 feet up the track, and almost demolished by the collision. In the face of these- plain physical facts, we can *439 not accept this testimony as reflecting the true facts of the case, and we feel justified in reaching the conclusion that the speed of the Villere car, as it approached this crossing,'was excessive and extremely dangerous to vehicles attempting to cross at that particular point.
The conductor and motorman both testify that the gong was sounded as they approached the North Rendon street crossing. The conductor of the Spanish Port train, which first passed the crossing and then the Villere ear about 45 feet below it, states positively that he heard no gong signal from the Villere car. Neither did J. B. Perchaud, Jr., who was in the Cole car, and near fhe scene of the accident, hear any such signal. Nor was the gong heard by the chauffeur of the Gannon car, before he drove on the track. The weight of the testimony in the case is to the effect that no such signal was given by the employees of defendant railway company in charge of the Villere car.
J. B. Perchaud^ Jr., describes the Villere ear in question as “one of those Villere cars, as it runs it bounces up and down that way.” It is further described in the testimony of L. J. Guilbeau, a motorman of defendant railway company:
“Q. Was that a new car? A. No, been in service a long time. Q. A very old car? A. At times they put it on runs. Q. It was not even painted, was it? A. It had been painted when it was new. It was pretty old then. Q. Pixed up since? A. Yes, all fixed up since. Q. Did it have an air brake on it? A. No, hand brake.”
W. P. Loan, assistant claim agent of defendant railway company, testified as follows, concerning the hand brake:
“Q. Say, when you have car operated by hand brake and the car is in good condition, and proceeding along at three-fourths speed, and there is a sudden necessity to stop the car, also assuming that the brakes are in good condition, within what distance would a capable motoneer be able to stop that car with a hand brake and that car is empty? A. Within 100 to 125 feet. Q. In how much shorter time would he be able to stop under the same circumstances by using the reverse as well as the hand brake? A. Between 50 and 75 feet, because there is a momentum to the car.”
This expert testifies as to the distance that a stop could be made under favorable conditions at three-fourths speed. This testimony, however, throws no light on stops made at excessive rates of speed, except to prove that attempted stops, under such circumstances, are utterly impracticable, within any reasonable or safe distance, after the danger is discovered. To operate a light car equipped with a hand brake, at an excessive rate of speed, over a public crossing in a populous city, in absence of the usual signals, as in this case, is proof of gross negligence, especially on account of the obstructions, more or less, of view at this crossing, on the right-hand side before reaching same, occasioned by poles and shrubbery located along the neutral ground on the lower side of Canal street. This crossing was rendered especially dangerous, at the time of the accident, by the fact that a Spanish Eort train, composed of motor car and trailer, was approaching the crossing on the inbound track and at the same time the Villere car was neaiúng it on the outbound track. The Gannon car had stopped at the crossing to allow the Spanish Eort train to pass. This is the testimony of the chauffeur of the Gannon car, and it is fully corroborated by the conductor of the Spanish Eort train, who states that he noticed the Gannon car standing there, as he stood on the platform of the motor car of the Spanish Eort train, and as it was passing the crossing. This is necessarily true, as it is admitted by all of the witnesses, that the Spanish Fort train passed the crossing first, and passed the Villere car about 45 feet on the other side of the crossing.
The conductor of the Spanish Eort train testified as follows:
*442 “Q. When you first saw the automobile, you were about in the middle of the crossing? A. Yes, that is, the train was in the middle of the crossing. We had two coaches. Q. The automobile was at the crossing? .A. Yes, sir. Q. Where was the automobile, across the other track? A. About 10 feet out from the track. Q. Was it partly headed to cross the street? A. No, sir; she was on an angle. Q. And it stopped? A. Yes, sir. Q. Was that automobile visible to the Villere car in that position? A. No, I cannot say that.”
This testimony was given on cross-examination. The witness had already testified on direct examination that he saw the Gannon automobile at this crossing and it had stopped.
This testimony of the conductor of the Spanish Fort train flatly contradicts the testimony of the conductor and motorman of the Villere car, in their statements that the Gannon ear, without stopping, turned suddenly to the left and moved on this crossing in front of the Villere ear. The testimony of these two witnesses is also contradicted by that of the chauffeur of the Gannon car, that he stopped to let the Spanish Fort train pass by the crossing.
The conductor and motorman of the Villere car both admit in their testimony that they saw the Gannon car in Canal street, when the Villere ear had reached the middle of the block, at the end of which is located this crossing. They were both aware of the presence of this car, and, if we take their testimony as true, their eyes were fixed upon it from the time they first observed the machine, until the collision occurred. These witnesses would have the court accept their statement that the Gannon car, without stopping at the crossing, without pausing an instant to ascertain if the tracks were clear, suddenly turned from its course on Canal street upon the outgoing track, and deliberately ran in front of the Villere car, as if the occupants of this automobile were bent on self-destruction. These statements of these witnesses are not satisfactorily corroborated. • They are not the true facts of this case. When they first saw this machine, they should have slackened speed, placed their ear under control, and sounded the gong, as they were not only approaching a public crossing, with footpaths on each side of same, but the Spanish Fort train was also approaching the same crossing, at which some of its passengers might alight. The danger of collision under such circumstances with either a vehicle, passenger from the other train, ■ or a pedestrian was self-evident, and the greater the danger-, the greater was' the necessity for their exercise of vigilance and care. Had they done what the circumstances of the situation clearly demanded, there would have been no accident, even if plaintiff had been at fault. We therefore are of the opinion that plaintiff is entitled to recover.
Some question has been raised about the amount of damages for the wrecked car. We have no way of ascertaining from the verdict of the jury what sum was allowed by them on this item. The quantum of damages claimed by plaintiff, including -that to the automobile, is the sum of $27,107.60. The verdict of the jury is for the sum of $5,000 in solido against defendant companies, and for the additional sum of $5,000 against the defendant railway company. In the itemized statement in plaintiff’s petition, damages to the automobile are fixed at $1,150. The record fail^ to disclose how much of this sum was included in the verdict returned.
The plaintiff was severely injured by, the collision. He was badly shocked, and, when examined by Dr. Souchon at the Hotel Dieu, was semiconscious, cold in his extremities, clammy, and perspiring very freely. He sustained in the accident a badly contused and lacerated wound of the head, small wounds in both hands, a number of bad bruises, and four or five broken ribs. His recovery was slow. At the time of the accident plaintiff *444 was the president of the Hibernia Bank' & Trust Copapany, and was receiving per annum a salary of $25,000. Since sustaining the injuries in the collision, plaintiff has not been able to follow any pursuit, because of physical weakness and nervous condition. Under these circumstances, the verdict is not excessive.
The judgment appealed from is therefore affirmed, at the costs of appellants.