No. 9160
Orleans

MRS. ROBERT P. BURTON, Appellant, v. ILLINOIS CENTRAL RAILROAD

(October 5, 1925, Opinion and Decree)
(November 2, 1925, Rehearing Refused)
(December 11, 1925, Writ of Certiorari and Review Denied by Supreme Court)

(*Syllabus by the Court.*)

1. **Louisiana Digest—Railroads—Par. 64.**
A person approaching a railroad track should stop, look and listen for an approaching train.

2. **Louisiana Digest—Railroads—Par. 63.**
If the evidence shows that by the use of the senses of sight and hearing a person crossing a railroad track could have seen or heard an approaching train, and he is struck by it, the legal conclusion is that he was negligent, and therefore he cannot recover.

3. **Louisiana Digest—Railroads—Par. 58.**
An engineer has a right to presume that a human being will exercise the instinct of self-preservation and will move off of the track before the engine strikes him.
(Civil Code, Art. 2315.    Editor's note.)

Appeal from Civil District Court, Hon. Sam. A. LeBlanc, Judge.

This is a suit for damages arising out of the killing of plaintiff's husband by being run over by railway cars. The case was tried by a jury and a verdict was rendered for defendant, a judgment was rendered accordingly, from which the plaintiff appealed.

Judgment affirmed.

H. W. Robinson and E. M. Robbert, of New Orleans, attorneys for plaintiff, appellant.

Lemle, Moreno and Lemle, of New Orleans, attorneys for defendant, appellee.

CLAIBORNE, J.    Plaintiff's husband was run over and killed by the defendant's

cars. In her name, and in the name of his children, she claims $35,000 damages.

She alleges that her husband was 34 years of age and a jewelry salesman earning $500 per month; that part of the railway system of defendant is the double track in the Parish of Jefferson which crosses at right angle the Shrewsbury Road, running from the Mississippi River to the Metairie Road about a mile and a half above the City of New Orleans and having an enormous traffic of pedestrians, automobiles, trucks and wagons; that at the point where the inbound and outgoing tracks of the railroad bisect said Shrewsbury Road, about a mile from the river, the tracks are elevated about twelve feet above roadway, and the ascent of the incline instead of being gradual is abrupt and begins at only 35 feet from the first rail; that the inbound track runs on the side nearest to the river, and the outbound track runs on the side nearest to the lake; that the inbound and outbound tracks are about thirty feet apart and a switch track lies along the inbound track on the said nearest to the river; that the railroad maintains no flagman nor gates at said crossing, but for warning, depends upon an automatic bell; that the construction of said crossing is a dangerous trap for travelers and has been the scene of many accidents; that because of the danger at this crossing the Race Track manager, during the races, placed a flagman there; that in October, 1921, the Police Jury of the Parish of Jefferson adopted an ordinance denouncing the crossing as a public nuisance and demanding that the railroad place there gates and a flagman; that traveling upon the Shrewsbury Road in the direction of the railroad track it is impossible to see an approaching train coming from up the river on the inbound track until one is upon the switch track; that immediately along the upper side of the Shrewsbury Road, about twenty feet from the inbound track towards the river, is a frame store building about twenty feet high and thirty feet wide, masking any view of the track; that foliage along the track intercepts the vision for a dozen feet beyond the store, that at about 250 feet up the track is a high board fence; and about 800 feet up is a large covered wharf and shed to unload horses at the race track, which completely shuts off any view of the track beyond that point; that the incline from the road to the track is not only extremely steep, but kept in very bad condition; that the space beween the rails is roughly planked; that there is a fall of several inches where the planking ends, and the gravel begins, all of which make it necessary for a chauffeur to give very careful attention to the road, and to divide his attention between the road and the train.

That alongside the embankment upon which the tracks are elevated are cattle guards over which an automobile could not be driven, so that it is impossible to drive to the right or to the left to avoid the trains; that in addition to the above conditions, the incoming and outgoing tracks are so close together that the noise of passing trains drowns the sound of any other train, and also the automatic signal, which thereby becomes worthless for giving warning of approaching trains; that on the morning of August 20, 1921, at eleven-five o'clock, plaintiff's husband, driving on the Shrewsbury Road approached the inbound railroad crossing from the river side, driving a runabout automobile; that as he approached same a long freight train came in view and was crossing the Shrewsbury Road in the outbound track, nearest the lake, the noise of which drowned every other noise; that plaintiff upon approaching said track, stopped, looked, and listened, and seeing no other train approaching, proceeded up the incline, intending, doubtless,

to wait upon the intervening space between the inbound and outbound tracks, about 35 feet wide, until the above mentioned outbound freight train had passed; that the Panama Limited train, running on the inbound track, was then approaching, but that plaintiff could not see it on account of the above mentioned obstructions on the track; that the automatic signal did not begin ringing until thirty seconds before the train passed; that he received no warning of its approach; that the above train was due in New Orleans at 11:20; that the train was then late, and in order to gain time it was then going at an abnormal rate, of over seventy miles an hour, which, under the circumstances, was extremely dangerous; that the Panama Limited should have approached said crossing at a slow and guarded speed, for the reason that another train was crossing said road at the same time, creating a dangerous situation for travelers; that plaintiff's husband moved slowly over said intersection; that he was in plain view of the engineer of the Panama Limited for more than one thousand feet, and that had said train been moving at an ordinary rate of speed, it could have stopped at 880 feet, and the accident avoided, but that the said Panama train struck the automobile of plaintiff's husband, in which he was seated, knocked it about forty feet, and completely wrecked it.

Plaintiff's husband was thrown out of the automobile, and sustained internal injuries from which he suffered very great agony; that he was taken to the Charity Hospital where he died eight hours later! that the accident was caused solely by the negligence of the railroad.

For all of which the plaintiff claims $35,000 for herself and her minor children.

The defendant admitted that it ran its cars on tracks crossing the Shrewsbury Road, and that its Pamana Limited train struck the automobile in which plaintiff's husband was seated and wrecked it; but denied all the other allegations of the petition. Further answering, they denied "that the accident in question was due to any fault or negligence on behalf of itself, its agents or employees, and specially averred that the accident was due solely to the fault and negligence of the said Robert P. Burton in failing to stop, look and listen before attempting to cross the track of defendant, and failing to heed the approach of the Panama Limited train; that the said accident took place in broad daylight, and had the said Robert P. Burton looked he could have seen the train approaching". Defendant averred that the said Robert P. Burton was negligent in failing to hear the crossing signal blown on the whistle of the engine, and to heed the warning of the crossing bell, which was then ringing, and which is maintained as a warning to all those about to cross the track of an approaching train.

The case was tried by a jury who returned a verdict for defendant; a judgment was rendered accordingly, from which the plaintiff appealed.

There is little conflict as to the facts of the case.

The plaintiff in his auto proceeded at a slow rate along the Shrewsbury Road from the river towards the lake. He reached the tracks of the defendant railroad and had almost cleared them when "the front part of the pilot got the rear wheel of the machine, and whirled the machine around and threw his body out of the car up against the side of the engine, then carried him over about thirty feet against this box flying in the air, the machine went down in the ditch demolished".

The train stopped, picked him up, put him in the baggage car, and then sent him to the hospital where he died a few hours later.

The evidence does not support several allegations of the petition.

The Shrewsbury Road is not the only highway from the City to the North and West. There is another along Oak Street.

The tracks of the defendant are elevated only six feet above the roadway.

The inbound and outbound tracks are 102 feet apart.

The defendant railroad placed flagmen on crossing during the races.

Where the planking on the side of the track ends and the gravel begins, there is a fall equal to the thickness of the plank.

The cattle guards upon each of the inbound and outbound tracks are only on the New Orleans side of the crossing and not upon both sides.

The train was not late, on the contrary, it was on time, and was killing time or had "clock time" to reach its destination on time.

It is not proven that any other accident happened on said crossing.

The locality where the accident occurred may be described as follows:

The Shrewsbury Road runs in the direction of the river towards the lake at about a mile and a half from the river, the defendant runs two tracks at right angles across the road; the track nearer the river runs to New Orleans, and the track nearest the lake runs from New Orleans northward towards Chicago; the distance between the two tracks is 102 feet.

The embankment upon which the tracks are laid is five feet above the level of the road. The road between the two tracks and upon either side of the tracks is twenty feet wide, and paved with gravel, and is maintained by the Jefferson Highway Commission. Between the tracks the railroad had built a plank road sixteen feet wide on a level with the top of the rails. The gravel road and the plank road are in good condition. The approaches of the Shrewsbury Road, leading up to the railroad track, form a ramp or incline about thirty-six feet in length or an ascent of one foot in every six feet or about 7½ degrees. This incline is also paved with gravel. There is some evidence that this incline had not a straight line on the top, but was "hollow or went down in the middle". The whole crossing was good. Traveling on the Shrewsbury Road, in the direction of the railroad tracks, there was on the left side of the road, a grocery store, a two-story building, 94 feet from the center line of the main track; opposite this building on the right hand side of the road was a railroad crossing sign a hundred and fifteen feet from the main track; next came a small shed, and then a dance hall about 18 feet high, fifty feet from the main track, both these buildings were about 25 feet from the Shrewsbury Road; behind this dance hall and equi-distant from the railroad track were two houses; about 900 feet above the track was a platform and shed. Leaving the grocery and the dance hall in the rear, the incline began 35 feet from the track; on the right side of this incline, about 20 feet from the track, was a railroad crossing sign and an automatic signal bell; at the top of the incline was an industrial, or passing, or switch track, with rails about five feet apart; then came a vacant space, about eight feet wide from the main track; and lastly the inbound or southbound track.

A witness was asked:

"Q. Put yourself in the center of the Shrewsbury Road, Mr. Murphy, on a line with the left hand wall of the two-story building (94 feet from the tracks), and look towards Chicago, how far up the track can you see?
"A. One hundred sixty-five feet.
"Q. At that point, fifty feet from the center of the main line, how far up the track can you see, looking toward Chicago?
"A. Well, when you are fifty feet from the track, supposing it is cleared all the way down there for 50 feet out, you ought

to be able to see as far as your eyes could carry you for a couple of miles, there is nothing out there.

"Q. On that day, when making the map, did you actually stand at that point from the track and look up the track?

"A. Yes, sir; and I know you can see a great distance, standing out from the main line 40 feet, I could see a train almost at Harahan, which is three miles up the road; the track is straight all the way."

Anthony Rouprich, a witness for the plaintiff, testifies as follows:

"Q. When you are a distance, as I understood your testimony, of 25 or 30 feet from the track?

"A. On the Shrewsbury Road, yes, sir.

"Q. You can stop your automobile and look down or up the tracks of the Illinois-Central for a distance of 900 or 1000 feet, is that right?

"A. Yes.

"Q. Then as you pass up towards the switch track that distance of 25 feet your vision of the southbound train is at a greater distance, is it not?

"A. As you come closer to the tracks?

"Q. Yes, it increased, does it not?

"A. Yes, sir.

"Q. And when you get on the industry or switch track, you have a full view of the southbound track for a distance of how long, or how far?

"A. Well, practically if you are on the southbound switch track very nigh to the other car coming at most any distance.

"Q. You could see at a distance of two or three miles, could you not?

"A. Yes.

"Q. Well, Mr. Rouprich, if you are coming up that grade and stopped on the industry or switch track and looked towards the southbound Panama Limited train, you could see the road for two or three miles? Could you not?

"A. At least two miles I think, yes.

"Q. Then there is a distance of about six or eight feet between the industry track and the southbound Panama Limited track, is there not, Mr. Rouprich?

"A. Yes.

"Q. And if you got your automobile in between the passing track and the southbound Panama Limited track, you could look up the southbound Panama Limited track a distance of two or three miles and see a train coming, could you not?

"A. Yes, if you are on top of the track.

"Q. If you were in between the two trains?

"A. Yes.

"Q. If you were in between the industry track and the southbound Panama Limited track, you could see up the track a distance of some two or three miles, could you not?

"A. Yes.

"Q. Now, it is a fact, is it not, that when you get up to a point 25 feet from the industry track that the houses on the west of the track are not in between you and the cattle shed or the unloading shed, is it?

"A. Well, that shed would be the barn.

"Q. But suppose you got up to a line even with the barn?

"A. Well, then you would be passed the barn, you would be on this side of the barn, and it would not interfere with you up to the unloading shed.

"Q. In other words, the barn is 25 feet away from the passing track?

"A. Yes, sir.

"Q. And if you get up to a point twenty-five feet away, the barn would be on the side of you?

"A. Yes, sir.

"Q. And you could look up the track; that is, when you get to the shed, then you could see that train for a distance of 1000 feet?

"A. Nine hundred to one thousand feet."

It has been testified that the plaintiff's husband was crossing the track leisurely, and that the train was running at a speed of thirty-five miles an hour; assuming that the plaintiff's husband was advancing at the rate of three and a half miles an hour, then the train was traveling ten times faster than he was. It follows, therefore, that when the plaintiff's husband reached the bottom of the incline or a distance of thirty-five feet from the track, the train must have been ten times further up the track or three hundred and fifty feet.

The evidence is overwhelming that at a distance of thirty-five feet from the track, plaintiff's husband could have seen defendant's cars. The nearer the track the plaintiff's husband advanced, the nearer the

train was to him. So that when the plaintiff's husband reached the switch track, thirteen feet from the main track, the defendant's train was only one hundred and thirty feet from him and in plain view. If plaintiff's husband had been vigilant all along, or at least, at that point, he could have seen the oncoming train. If he did not see it it was because he did not look. If he did not look, the cause of the accident is his own fault.

But the plaintiff argues that the defendant should have seen the deceased and should have stopped the train to avoid the accident, invoking the rule of the last clear chance. But the plaintiff alleged that for all the reasons stated in her petition, the deceased could not see the train. If that be true, then for the same reasons, the defendant could not see the deceased.

But the plaintiff's argument has no force. It is not the duty of a train to stop whenever the engineer sees a human being upon the track. The engineer has a right to presume that the human being will exercise the instinct of self-perservation and will move off of the 'track before the engine strikes him. Farrar vs. New Orleans & C. R. Co., 52 La. Ann. 417, 26 South, 995; Vanon vs. Louisiana Ry & Nav. Co., 143 La. 1085, 79 South. 869; Nolan vs. Illinois Central R. R. Co., 145 La. 487, 82 South. 590; Saitta vs. Yazoo & M. V. R. Co., 153 La. 1099, 97 South. 261; Schwartz vs. New Orleans & C. R. Co., 110 La. 534, 545, 34 South. 667; Ford vs. Tremont Lumber Co., 123 La. 742, 49 South. 492.

One is not guilty of negligence in not anticipating that another will ·be negligent. Fitzpatrick vs. Letten, 123 La. 748, 49 South. 494.

The courts must also presume that the engineer will not wilfully run over a human being. In this case, notwithstanding the two railroad signs 115 feet and 20 feet from the track, notwithstanding the switch

track, and the whistling of the engine 3000 feet away, and the ringing of the automatic railroad bell at the crossing itself, the deceased kept on his onward course. When the engineer saw, or could have seen, the deceased three hundred and fifty feet ahead of him about to cross his track, he gave the two whistles as a danger signal and put on the brakes, but it was then too late for him to come to a stop before he struck the deceased. The evidence is that a train running at the rate of thirty-five miles an hour cannot be stopped inside of· 600 feet. In this case the train was stopped within seven hundred feet of the place of the accident, which is an evidence that it was not running at an excessive speed.

This is not a parallel to McClanahan vs. V. S. & P. Ry., 111 La. 781, 35 South. 902, where the deceased was lying unconscious across the track. In that case, the engineer could and should have seen the deceased, and had no right to presume that he would move away from the track because he was unable to do so.

We think the reasons given by us in the case of Gibbons vs. New Orleans Terminal Company, No. 8738, affirmed by the Supreme Court, apply equally well to this case. In that case, we said:

"The law makes it the duty of chauffeurs upon approaching railroad tracks to stop, look and listen.

"It is not sufficient for a plaintiff to have looked and listened; it must have done so at the opportune time and in an efficient manner.

"The presumption of law *juris et de jure* is that a plaintiff saw a thing that he should have seen had he looked and that he failed to look at the proper time and in the proper manner if he did not see the things he should have seen by looking.

"No failure on the part of the railroad company to do its duty will excuse anyone from using the senses of sight and hearing upon approaching a railway crossing; and whenever the due use of either sense would have enabled the injured person to escape the danger, the injury is conclusive evi-

dence of negligence without any reference to the railroad's failure to perform its duty." Tucker vs. Ill. Cent. R. R., 141 La. 1096-1101, 76 South. 212.

"But on the other hand, those who travel, on the common road, and are approaching a railroad track are bound to exercise due care and ordinary diligence to ascertain if a train is approaching, even if to their knowledge of the road's schedule no train is due at that particular time.

"Before attempting to cross a railroad track they are bound to use 'their senses, to listen, and to look, in order to avoid any possible accident from an approaching train.

"Hence, it is negligence on the part of such a person to attempt to cross a railroad track which is several feet above the level of surrounding fields, on which there are no obstructions to view or to sound in broad daylight and to fail to look either way on the track or to listen to the noise made by an approaching train running at a great speed. In such a case, as his negligence has contributed to the accident, he cannot recover damages against the railroad company." Brown vs. Rrd., 42 La. Ann. 350, 7 South. 682; Callery vs. Morgan's La. & T. R. & S. S. Co., 139 La. 763, 72 South. 222; State vs. Ross, 144 La. 909, 81 South. 386; Gannon vs. New Orleans Ry. & Light Co., 154 La. 435, 97 South. 601; Consolidated Companies vs. Yazoo & M. V. R. Co., 155 La. 233, 99 South. 203; Young vs. Louisiana Western R. Co., 153 La. 129, 95 South. 511.

"Where plaintiff's decedent, driving an automobile, approached defendant's railroad crossing without looking for a train which would have been visible at least 40 to 50 feet away, and was struck, held: That he was grossly negligent, barring recovery." Jeansonne vs. Rrd., 156 La. 237; 153 La. 129.

We have come to the conclusion that plaintiff was negligent and therefore he cannot recover.

"The true doctrine for which no citation of authority can be necessary is that plaintiff cannot recover for injuries caused by the negligence of defendant, if his own negligence was to some extent the proximate cause of the result complained of."

Belle Alliance vs. Texas Rrd., 125 La. 777, 51 South. 846.

We have scrutinized the record with great care, and one of the judges of this court visited the locality, and we have failed to discover any negligence on the part of the defendant.

The judgment is therefore affirmed.