#### No. ——.
#### First Circuit

MRS. PHILLIPINE MAJOR GUILLOT Individually and as Tutrix, v. LOUISIANA RAILWAY AND NAVIGATION COMPANY

(November 10, 1925, Opinion and Decree)
(December 22, 1925, Rehearing Refused)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Negligence—Par. 42.**
In order to recover damages it must be proven that the defendant was at fault or negligent.

2. **Louisiana Digest—Railroads—Par. 60, 61, 62, 67.**
Where the evidence shows that, at the time of the accident, railroad had a flagman at the crossing holding a red lantern, and that the engine foreman was standing on top of the car two feet below which he had placed a fusee which threw a bright light ahead of the train, and the other members of the crew were attending to their duties, the engineer not running the train over six miles per hour, the defendant railroad was clearly not negligent and there can be no recovery for the accident.

3. **Louisiana Digest—Railroads—Par. 58.**
Trainmen have the right to believe that a person approaching the railroad will exercise his senses of sight and hearing so as to perceive the approaching train in time to avoid an accident.

4. **Louisiana Digest—Railroads—Par. 78.**
In order to enforce the doctrine of the "last clear chance" it must appear that the trainmen after seeing the danger, by the exercise of ordinary care could have avoided it. Where the stop signal was immediately given to the engineer who applied the brakes, which were in good condition, the doctrine of "last clear chance" does not apply.

(Civil Code, Article 2315. Editor's note.)

Appeal from the Parish of East Baton Rouge, Hon. W. Carruth Jones, Judge.

This is a suit for damages caused by a collision between a railroad at a crossing and a bus on which the plaintiff was riding. There was judgment for plaintiff and defendant appealed.

Judgment reversed.

Dewey J. Sanchez and H. Payne Breazeale, of Baton Rouge, attorneys for plaintiff, appellee.

Laycock, Borron and Laycock, of Baton Rouge, attorneys for defendant, appellant.

MOUTON, J.   The defendant company's railway track runs north and south through the City if Baton Rouge. Main Street, one of its principal thoroughfares, runs east and west through said city, and is crossed at right angles by the track of defendant company. On the 2nd of Feb., 1923, at about eleven o'clock P. M., while Ludovic Frank Guillot, the deceased husband of plaintiff, was going over the crossing of said company on Main Street in an omnibus which was operated by Louis Simoneaux, and as the bus was about negotiating the crossing, Guillot either jumped out or fell therefrom, and, as a result, suffered injuries from which he died shortly thereafter.

Plaintiff, the surviving wife of deceased, charging that the death of her husband was due entirely to the fault of the negligence of defendant, sues the latter in damages of $17,500.00, individually, and for a like sum for June Major Guillot, her minor child, with legal interest from judicial demand. The District Judge rendered judgment against defendant company for $10,000.00; $5,000.00 for the widow, and $5,000.00 for the minor, with legal interest as prayed for. The company appeals.

The bus in which Guillot was riding was the property of Louis Simoneaux who was regularly engaged in the transportation of passengers from the plant of the Standard Oil Company to the City of Baton Rouge. At the time of the accident the bus had entered the city, and was traveling on Main Street westward towards the river. At about the time the bus was nearing the crossing of defendant company on Main Street, a train of the company was backing up on its track from the direction of Laurel Street, south of the crossing, and was going northward. This train was made up of an engine, two gondolas or open cars, and a box car. It is clearly shown that Sumrall, the car engine foreman on this short train, had placed a fusee or red light at about two feet below the top of this box car when he left North Boulevard Street several blocks south of the crossing. This fusee, the record shows, gives a brilliant, glowing light for a considerable distance along the track and is not affected by rainy or dark nights, being dimed only by the fogs. The night was dark or rainy when the accident happened, but there is no proof it was foggy, and the record shows the fusee was burning with its accustomed brightness up to the time the train was nearing the crossing. The members constituting the crew on the train say the bell was ringing as it was backing up, while several witnesses for plaintiff who were in the bus, deny that it was.

On this question there is some conflict in the evidence although it may be reasonably said that the parties in charge of the train were in a better position to notice if the bell was ringing or not. Be that as it may it is certain that the fusee was burning practically at the top of this box car, which was the "approaching" car, as it is described in the language of the trainmen. Three photographs were taken showing the view down the railroad track south of the crossing at Main Street. In taking photograph No. 1, the

photographer was standing at a distance of 75 feet east of the railway track. From that point the photograph and evidence show that a person could see an object at 102 feet down the track, south from the crossing. By photo., No. 2, when standing 50 feet from the railroad track, it is shown an object could be seen down the track at a distance of 194 feet; and at 102 feet from the track, as shown by Photo. No. 3, the view could be clear along the track southward to a distance of 71 feet. It is also shown that at the time of the acident there was no impediment or building which could have obstructed the view along this railway track south from the crossing.

C. L. Leewald was driving the bus in which deceased was riding, was an experienced chauffeur and in the employ of Simoneaux as driver for the transportation of passengers. In accordance with its agreement with the City of Baton Rouge, defendant had placed a flagman or watchman at the crossing in question on Main Street and had established a system of flagging and signals for the protection of all street crossings. Simoneaux, owner of the bus, was riding on it when deceased was fatally injured. He says, he was sitting in front of the bus, on the left side of the driver and next to him. As he was coming westward, and was on the left, he had a clear view ahead of him, and southward down the track from the crossing. He says, he saw the flagman with a red lantern in his left hand and white lantern in his right hand. At first he stated the red lantern was motionless, and persisted in this statement in answer to several questions on cross-examination. Finally, he was asked the following: "And the flagman was standing out in the street, with a red lantern in his left hand, stationery, holding his left hand out towards the center of the street, wasn't he?" Answer: "Yes, sir". The hand of the flagman, though motionless, was being held towards the center of the street and was unquestionably intended as a signal of danger. The proof shows that a Ford car passed the bus on Main Street going west and in the same direction, about 100 feet east of the crossing. Simoneaux says the Ford car went across the track and was ahead of him 75 feet when it cleared the crossing. His statement is that the flagman came out as soon as this Ford car went across. Making proper allowance for the width of the track, Simoneaux must have been at a distance of not less than 70 feet from the track when he saw the flagman pointing to the center of the street with his red lantern. He says that he did not see the fusee or red light before the bus got about 20 feet from the railroad track. It is unbelievable that a man situated as he was on the front seat of that bus with the glowing light of that fusee shining from the top of that car and with an unobstructed view down Main Street from the crossing, as was shown by the photos and evidence above referred to, did not see that train before he reached to a point of about 20 feet from the track. To say the least, this is very singular, if it be true, when we consider that this witness was the owner of the bus then regularly engaged in the transportation business. Leewald, the driver, says the flagman had two lights, white and red. As to the red he testifies, he had it hanging by his side, and, was not holding it out and in this particular he does not agree with Simoneaux. He says, he did not see the the train until he was 20 feet from the track; that it was then too late to stop, that he had speeded and went across. Strange to say, this driver, did not see a red light or fusee, which, however, was seen by Simoneaux who was

not driving and by most of the other witnesses who testified in the case. That the driver of a bus, an experienced chauffeur, with 15 or 20 passengers in his charge at such a crossing, on a dark night, should have failed to see the glaring light of this fusee, is indeed passing strange. He must certainly have been oblivious of his surroundings, and mindless of the responsibilities of his position.

Mansor, witness for defendant, was in the Ford car which passed ahead of the bus on Main Street going towards the crossing. Rice was driving the Ford. Mansor saw the flagman with a red lantern in his left hand and a white in his right. He was, he says possibly 50 or 100 feet from the crossing when he first saw the flagman, who was then holding out the red light straight. In this particular his statement is in accord with the testimony of Simoneaux. He also saw the fusee, and was then about 30 or 40 feet from the track. He states they had ample time to stop, but that Rice drove across the track, and, adds: "We shouldn't have done so." Rice, the driver of the Ford, saw the flagman with a white and red light in his hands, but could not say in which hand he held the light; could not say how far he was from the crossing when he sighted the flagman. He explains that when he left the Standard Oil plant he saw a train headed south and when he saw the flagman with his lights, thought it was for the train coming from that direction, and looked to the north side of the crossing. Obviously, his vision was fixed in that direction which accounts for the fact, as we read the evidence, that he did not take in the situation as fully as was done by Mansor, his companion in the Ford. Rice, however, saw the red light on the box car, and says he saw the flagman in ample time to have stopped, if he wanted to. This Ford car, as before stated, had passed ahead of the bus, and when it cleared the track, was about 75 feet from the bus, as was testified to by Simoneaux. Whether it was at that distance ahead or not quite that much, it is quite certain that it had left a clearance or a space between it and the bus of some 50 or 60 feet. It is impossible to believe, that Simoneaux and Leewald who were seated on the front seat of the bus did not see this flagman, and the fusee on the car, in time to stop the bus to allow the safe passing of the train over the crossing. The preponderance of the evidence clearly shows that the flagman was standing a few feet west of the railway track, was in or near the center of Main Street when the bus approached the crossing. He was at his post of duty, was holding in his left hand a red light which, Simoneaux and Leewald unquestionably knew, was a danger signal. It must be observed that the flagman was not a traffic officer, and could not by force, stop the bus from going across. All he could do was to hold out the red light as a warning to travelers coming towards the crossing. The duty of the driver of the bus was to stop and allow the train to pass to which the flagman had given a semicircle signal with his white light, meaning that the crossing was clear. Instead of stopping, Leewald stepped on the gas as he was directed by Simoneaux, and dashed over the crossing, and as he was about negotiating it, deceased either jumped out or fell from the bus which was then dangerously near the moving train. Obviously, the driver took a desperate chance and his bus with several other passengers had a hair-breadth escape. Simoneaux and Leewald were clearly at fault. Even if they were at fault, counsel for plaintiff says, their negligence can not be imputed to the deceased, who was a passenger for hire. This is the law, and no authority is needed to be cited in support of this contention.

It is equally certain that the railway company, defendant, cannot be held liable unless it was at fault or negligent. This is also unquestionably the rule of law, under the plain provisions of Article C. C., 2315. upon which this action is founded. It is well shown that defendant company had a flagman at the crossing at the time for the reasons above given, and which it is not necessary to reiterate. It is equally well established that as a precautionary measure the engine foreman who was standing on top of the car had placed a fusee about two feet below the top which threw a bright light ahead of the train, and on its sides, by reflection. The other members of the crew, it appears, were all attending to their duties, including the engineer who was backing up at the slow rate of about 6 miles per hour. The defendant company was therefore living up to all the requirements of the general law governing its duties under the existing situation, and the obligations it had incurred under its agreement with the City of Baton Rouge. It was managing its train with care, and had all the safeguards that could be expected for the protection of travelers in vehicles or otherwise that might be passing over the crossing in question, it was therefore not at fault and can not be held liable, unless it be under the plea of the "Last Clear Chance", which though not directly pleaded was permitted to enter as a factor in the determination of the case because of the enlargement of the pleadings, which it is contended, was effected by the character of the evidence admitted without objection.

The proof shows that the flagman who died before the trial of this case gave the signal to Sumrall, the engine foreman, with his white lantern to come on with his train; that this meant the track was clear at the crossing. Sumrall, upon receiving this signal, proceeded on his way with the train which was then about 100 feet from the crossing. As he got at about 75 feet of the crossing he saw the bus. Undoubtedly he had every reason to think that the driver of the bus had seen or heard his advancing train. When he saw the bus, he said it never occurred to him or he never thought that the driver of the bus would try to cross ahead of the train. Obviously, any normal person running a train under such circumstances would have acted in a similar manner. In such situations the general rule is that: "Trainmen have the right to believe that a person approaching the railroad track will exercise his senses of sight and hearing so as to perceive the approaching train in time to avoid all accidents;" Cook vs. Louisiana & N. W. R. Co., 130 La. 917, 58 South. 767; Sickinger vs. Board of Directors of Pub. Schools for Parish of Orleans, 147 La. 487, 85 South. 212; Elliott on Railroads, No. 3, Sec. 1646. The engine foreman was therefore not negligent in thus assuming that the driver of the bus would not undertake to pass ahead when in such a perilous situation. At that time, Sumrall says the flagman was standing in the middle of the street near the track, and that his engine bell was ringing. No one could have reasonably expected, under such conditions, that the bus would dash over the crossing.

When Sumrall realized that the bus would attempt to cross, he says, he immediately gave the stop signal to the engineer to stop the train. The engineer applied the brakes at once, which were in good order, but could not stop his train before going over the crossing. In Tyer vs. Gulf C. & S. F. R. Co., 143 La. 177, 78 South 438, the court said that in order to enforce the humanitarian doctrine of the "Last Clear Chance" it must appear that plaintiff has clearly shown the defendant, after seeing the danger, could by the exercise of ordinary care have avoided

the injury, etc. "Here, before explained, the engine foreman had the right to believe when he first saw the bus that the driver would not attempt to cross the track but when he realized he would undertake to do so, he immediately gave the stop signal to the engineer, but without avail. It was at that time that he saw the "danger" and he unquestionably exercised prompt and ordinary care by doing all in his power to avert the accident which the engineer could not possibly avoid for the reasons above stated. Considering this case from every angle either of law or fact, we are firmly convinced that the defendant company was not at fault, and that judgment was erroneously rendered against it.

It is therefore ordered and decreed that the judgment be avoided and reversed and that the demand of the plaintiff, for herself, individually, and as tutrix, be and is hereby rejected at her cost in both courts.