No. 585

First Circuit

WYATT ET AL. v. YAZOO & MISS. VALLEY R. R. CO. ET AL.

(April 14, 1930. Opinion and Decree.)
(May 6, 1930. Rehearing Refused.)
(July 2, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

Shelby Taylor and A. B. Parker, of Baton Rouge, attorneys for plaintiffs, appellants.

Breazeale & Sachse, of Baton Rouge, attorneys for defendants, appellees.

ELLIOTT, J. Yazoo & Mississippi Valley Railroad Company and Baton Rouge, Hammond & Eastern Railroad Company are sued in solido by Jesse E. Wyatt, Sr., and Mrs. Florence E. Wyatt for $15,000 in damages on account of the death of their son, Jesse E. Wyatt, Jr. They allege that Yazoo & Mississippi Valley Railroad co-operates the Baton Rouge, Hammond & Eastern Railroad under a lease. That their son was struck and killed on the public crossing at Sharps Station on said Baton Rouge, Hammond & Eastern Railroad by a train operated thereon by said Yazoo & Mississippi Valley Railroad Company. That their son lost his life as a result of the carelessness, negligence, and recklessness of Yazoo & Mississippi Valley Railroad Company. That the view eastward along the main line of the said Baton Rouge, Hammond & Eastern Railroad at Sharps Station was permitted by said Yazoo & Mississippi Valley Railroad Company to become obstructed. That it operated its trains thereover at excessive speed without taking the precautions made necessary as a result of the obstructed view, which it had permitted. That its agents and employees in charge of the train which killed their son did not give signals of its approach, etc. That it permitted the placing of gravel cars on the western side of the highway, still further hampering and obstructing the view. That it should have slowed down its trains, or else placed a flagman at the crossing, etc.

The motions and exceptions interposed against plaintiffs' demand are not urged in defendants' brief. We assume that they have been abandoned, and have not given them any consideration in acting on the case.

The defendants both deny the negligence, carelessness, recklessness, and fault alleged against them by the plaintiffs.

The Baton Rouge, Hammond & Eastern specially alleges in its answer that it is not liable to plaintiffs for the further reason that it had nothing to do with the operation of the train in question, nor with any of the other matters complained of in their petition. Both railroads deny that they were negligent in any way, but, if so, they urge in the alternative that decedent was also negligent and that his negligence contributed to, and, in fact, brought on the accident whereby he was killed.

There was judgment rejecting plaintiffs' demand, and they have appealed.

The accident occurred about 4 o'clock p. m., on April 29, 1926. Jesse E. Wyatt, the decedent, was employed at the time as a truck driver by Sam E. Finley, contractor, engaged in repairing the Baton Rouge and Hammond Highway. The asphalt used in this work was prepared in a mixing plant erected and operated at said station by said Finley. The railroad is crossed at this place by a public road running northward and southward known as Sharps road. This road connects in its southward course with the Baton Rouge and Hammond road, and was used for the purpose of conveying asphalt from said mixing plant to the said road being re-

paired. The mixing plant was situated on the northern side of the railroad, about 75 feet north of the railroad main line, and about 150 feet east of the public road. There were other smaller structures shown on a diagram filed in evidence. These other structures were all erected there by said contractor, and were being used at the time in question in connection with his mixing plant; they were distant about 40 feet from the main line of the rail-road, and situated in between the mixing plant and the public road. The evidence does not enable us to determine their exact distance from the crossing.

There was, in addition, at the time, piles of coal, sand, and gravel on the right of way just south of the mixing plant, but not high enough, in our opinion, to obstruct the view eastward of a man in an automobile from the crossing along the main line track. All these structures erected by Finley were situated north of the side track hereinafter mentioned. Two witnesses testified without contradiction that the mixing plant and other structures erected by Finley were all on defendants' right of way. A side track runs parallel to the main line of the railroad east and west of the crossing. This side track is on the north side of the main line, distant from it about ten feet. Two gravel cars were spotted on the side track west of the crossing; one of them projected a couple of feet over the crossing, but they are not alleged to have obstructed the view eastward, and did not, so we do not give them any further notice. Two cars, a box car and a coal car, were also spotted on the side track at the time in question, on the east side of the crossing. The box car was next to the crossing, the coal car was further east and about opposite the railroad platform. The distance of these cars from the crossing was vari-

ously estimated. Two witnesses testified that the box car was right up even with it, others thought that the one nearest to the crossing was 5 or 6 feet distant from it, others that the nearest one was 15 or 20 feet distant, while still another testified that the nearest car was 75 or 80 feet distant from the crossing. Some of the witnesses who estimated these distances were not present at the time of the accident. Acting on the estimates of those present, we find that the box car was 5 or 6 feet east of the crossing, and that the coal car was still further east. The asphalt mixing plant was operated by steam power, the smoke from which sometimes drifted over the railroad, and at other times it did not. One witness testified that there was smoke over the railroad at the time of the accident in question, another did not notice any smoke, still another did not think there was any over the railroad at the time. There was a platform which had been erected by the railroad company on the north side of the side track, situated up close to it. At the time in question, there was on top of this platform several tanks, barrels, etc. These structures, on the right of way railroad platform, with things on top of it, cars on the side track, obstructed the view eastward along the main line very seriously, as the crossing was approached going south until the side track was passed, after which it was unobstructed. The crossing was certainly dangerous for those approaching it going south, due to the obstructed view eastward.

The train that struck plaintiffs' son came from the east, and was going west. Plaintiffs' son, at the time in question, after obtaining his load at the mixing plant, first faced westward, but curved southwest as he proceeded toward the public road. While going west, his back was

turned in the direction from which came the train that killed him. His truck entered the public road about 150 feet from the mixing plant, and about 10 or 15 feet north of the crossing. The Louisiana Stop Law sign, on the north side of the crossing, was about 50 feet distant from it. His truck, leaving the mixing plant, passed to the left and south of this Stop Law sign. After reaching the public road, his truck turned south in the road toward the crossing. There was another Stop Law sign on the south side of the crossing, about 50 feet distant from it. There are no houses at Sharps Station, except a country store. It is not clear from the evidence whether there was one or two stores on the road side near the crossing. The evidence indicates but one residence in the neighborhood, that of Mr. Cook, and it was several hundred yards distant.

All people are charged with knowledge of the ordinary crossing dangers, and on coming thereto should look over, around, and beyond nearby cars on a side track for approaching trains, and may not expect the train to slacken its schedule speed of 30 or 35 miles at such a place. The railroad company, on the occasion in question, sounded its engine whistle and rang its bell on approaching this crossing, at a proper distance therefrom, and ordinarily that would have been sufficient.

. But as the railroad company had permitted the erection of structures on its right of way near the crossing that obstructed the view and hindered the seeing of approaching trains, and had permitted to be increased the ordinary crossing risks at this place, it should have taken more than ordinary care. It should have slowed down its train and done what was reasonably necessary to offset the increased danger. The situation did not require that the railroad company send a guard or watchman to this crossing before going over it with a train, as plaintiffs contend, but the railroad company did nothing to offset the increased danger due to the obstructions placed there by Finley.

The railroad company, its agents and authorities, through whom it acts, must be charged with knowing the increased danger, with knowing the use to which the crossing was subjected, due to the mixing plant. The defendant operating the train in question would be held responsible for the death of plaintiffs' son were it not that their averment that plaintiffs' son was also negligent and that his negligence contributed to . the accident, was established. It was, in fact, established that the act which caused their son to lose his life was in a more direct way the result of his own act, than the act of the defendants.

The evidence shows that the train which struck decedent was on schedule time. Sharps Station is not a regular stopping place. Passenger trains do not stop there except when flagged. Its speed on approaching the crossing was at the rate of 30 or 35 miles an hour. When plaintiffs' son turned southward in the public road toward the crossing, he should have looked to his left, which was eastward. His view eastward was obstructed in the way stated until after he had crossed the side track, after which there was nothing to obstruct his eastward view. The distance from there to the main line was about ten feet; he should have stopped his truck before going on the main line and looked along it eastward for trains. If necessary, and he could not otherwise see if a train was coming, he should have stopped on the side track and stepped forward to the south side of the same where he could

and would have had a clear view eastward along the main line. If he had stopped and looked, he could and would have seen the approach of the train that killed him.

The law, Act No. 12 of 1924, sec. 3, provides,

"That it shall be unlawful for any person to drive or propel any * * * automobile, truck or other motor driven vehicle upon any railroad track at a public highway, * * * intersecting such railroad at grade crossing without first stopping at a distance of not less than ten feet nor more than fifty feet from the nearest track and looking for train."

After providing some exceptions, which have no bearing on the present case, the statute proceeds:

"In the trial on all actions to recover personal injury * * * damages sustained by any driver of such motor driven vehicles by collision of said vehicle and train in which action it may appear that the said driver may have violated any of the provisions of this act, the question of whether or not the said violation was the sole or proximate cause of the accident and injury shall be for the jury to determine regardless of the penalizing feature of this act. That the violation of this act shall not affect recovery for damages and the question of negligence or the violation of this act shall be left to the jury; and the contributory negligence statutes of Louisiana shall apply in these cases as in other cases of negligence," etc.

All the witnesses who claim to have seen plaintiffs' son as he approached the crossing testify that he did not stop nor look eastward along the main line before driving on the track in the face of the oncoming west-bound train.

A witness named Watson testifies that he saw decedent and his truck as they approached the track, and that he did not stop, that he could see; that he was pulling in low as he entered on the main line where the train struck him:

"Q. You don't know then, whether he stopped his car after you heard the engine whistle?
"A. If he had, he would not have gotten as far as he did."

A witness named Anselmo testified that he heard the train whistle about 150 feet away. That Wyatt at that time was coming from under the loading rack, and had not gotten up on the track; that he was driving in low gear, that is about 3 miles an hour, and was about 13 or 14 feet from the main line at the time the train blew, and was looking down the road in the direction he was going. That he did not look eastward after crossing the side track.

A witness named Plauche stated that he was about 25 yards distant at the time, and on the western side of the crossing:

"Q. Now, tell how it happened?
"A. That fellow was coming with a load of hardsurface; he waved at me and I waved back at him. He told me 'Hello.' By the time I turned around that train struck him, and he went 230 yards before he could stop.
"Q. You saw Wyatt as he drove up in his truck?
"A. Yes.
"Q. Did he see you?
"A. Yes.
"Q. How do you know that he saw you?
"A. He was looking me right in the face.
"Q. Did he wave at you?
"A. Yes.
"Q. Did he holler at you?
"A. He just waved and I waved back.
"Q. He was then going over the crossing?
"A. He was going to cross.
"Q. He was looking away from the train then, in the opposite direction from which the train was coming?

"A. He was looking at me, yes.

"Q. The train was coming from the east, was it not?

"A. Yes.

"Q. And he was looking at you from the west?

"A. Yes.

"Q. And he waved at you?

"A. Yes.

"Q. If he had been looking toward the east he would have had time to stop, wouldn't he, before he got on the track?

"A. Yes, but he didn't stop.

"Q. He would have had time, though, wouldn't he?

"A. Yes."

A witness named Orr, sitting on the gallery of a store about 100 feet from the crossing, testified that he saw the train strike the decedent.

"Q. Mr. Orr, did you see Mr. Wyatt before he drove on the track?

"A. Yes, I saw him when he was coming."

He testified that Wyatt was looking down on the ground; that his truck was going slow. That he was not looking toward the track, but looking down, as though he were watching one of his wheels. That when Wyatt got on the main line, coming very slow, either his engine went dead, else he stopped his truck on the track. Witness says he could not hear on account of the noise made by the mixing plant machinery, but he was very clear in his statement that Wyatt was not looking down the track the way the train was coming, and when he did look eastward the train was close to him. Witness says that the mixing plant was in operation at the time, and that it made such a noise when running that the workmen there could not hear the train whistle nor the ringing of the bell, but that he heard it.

"Q. Did you hear the train before it hit Mr. Wyatt?

"A. I heard it blow.

"Q. How far away was it when it blew?

"A. It was about the cattle guard, about three or four hundred yards.

"Q. You heard it blow at the cattle guard 3 or 4 hundred yards from the crossing?

"A. Yes, I judge it to be that distance.

"Q. Did you hear it blow again just before it got to the crossing?

"A. Yes, it blew again before it hit Mr. Wyatt. They couldn't hear it on account of that machinery."

A witness named Cook was also in a store building, which, at one place in his testimony he estimated to have been about 100 yards from the crossing, and in another, as about 100 feet. He testified that he saw the accident. That he heard the train approaching; that it whistled first about the cattle guard, which he estimated to have been about 600 yards from the crossing, and says that he heard the bell ringing. That he saw the truck that Mr. Wyatt was driving as it drove on the track; that it looked like the truck stopped, but it might have been moving slow, and that, from what he could see, Wyatt was looking in the gravel car on the west side of the road, and not in the direction the train was coming.

Mrs. Cook lived near Sharps Station, her husband estimated the distance from his house to the crossing at about a quarter of a mile. She testified that she heard the train whistle twice; the first was about the cattle guard and the next was just before the crash of the impact. The engineer and fireman both say that the whistle blew for the crossing, which, according to their testimony, was about the

cattle guard, and that the bell was ringing as they approached. That they afterwards noticed a truck approaching it, upon which they sounded another alarm, but that it was too late after seeing the truck to avert striking it.

In the case of Vincent vs. R. R. & S. S. Co., 48 La. Ann. 933, 20 So. 207, 209, 55 Am. St. Rep. 287, the court, acting on a contention that the view was obstructed, approvingly quoted from Beech on Contributory Negligence, and Patterson's Accident Law:

"Plaintiff, in respect to the obstruction alleged, overlooks the fact that, if such obstructions really masked the view, they themselves were as much concealed from * * * the defendants' employees as the latter were from the persons in the buggy, and that the very fact of the existence of the same imposed additional caution upon parties approaching the track."

In Barnhill vs. T. & P. R. R. Co., 109 La. 43, 33 So. 63, 65, the court considered the case of a crippled man who approached a main line crossing, the view along which was obstructed by box cars on a side track. The case is very similar to the present one. The court approvingly quoted from a well-known legal writer:

" 'The traveler, however, is rigidly required to do all that care and prudence would dictate to avoid injury, and the greater the danger the greater the care that must be exercised to avoid it, and where, because of physical infirmities, darkness, snow, fog, the inclemency of the weather, buildings or other obstructions and hindrances, it is more than usually dificult to see or hear, greater precaution must be taken to avoid injury than would otherwise be necessary.' If the box car upon the switch was in close proximity to the crossing, it was Barnhill's duty to have peered around its side cautiously before venturing onto the main

track. Had he done this there was nothing to have prevented his observing the approaching train." Baltimore & Ohio R. R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, is to the same effect.

In Holstead vs. Vicksburg, S. & P. R. R. Co., 154 La. 1097, 98 So. 679, the court approved the principle applied in the above case as to caution, in case of an obstructed view of a main line crossing before entering on it.

In Aymond vs. Western Union, etc., et al., 151 La. 184, 91 So. 671, 672, the court said:

"As to the obligation to stop before crossing a railroad track, that must not be accepted so literally as to require a person upon approaching a railroad track to come at once to a position of absolute immobility; but common sense and common practice both indicate that it will suffice for such person to have his own motion so checked and under control that he may stop instantly if need be."

In Callery vs. Morgan's La. & Tex. R. R. & S. S. Co., 139 La. 763, 72 So. 222, 224, the court considering a contention that the view was obstructed, said:

"The rule that 'one who reaches a railway crossing on a public highway is under the duty to stop, look, and listen,' has been recognized and enforced by this court in numerous cases."

In some courts this rule has been modified, as to the duty to stop, but it has been properly held, we think, that the law exacts from the driver of an automobile a strict performance of the duty to stop, look, and listen before driving upon a railroad crossing where the view is obstructed.

Conceding for the sake of argument that defendants' trainmen were guilty of con-

current negligence in the premises, still the contributory negligence of the plaintiff debars recovery. The last chance doctrine has no application when the negligence of both parties was concurrent, and continued down to the moment of the accident.

In Young vs. Louisiana Western R. R. Co., 153 La. 129, 95 So. 511, the court said:

"The duty to stop, look, and listen before crossing a railroad must be performed at a time and place where stopping, looking, and listening will be effective."

Plaintiffs' son had been driving a truck hauling asphalt for several weeks, and during said time had passed over this crossing four or five times a day. It must therefore be supposed that he, as well as the railroad company, was aware of the danger due to the obstructed view eastward; but the duty of stopping, looking, and listening before going on it rested on him, and it was negligence not to do so, barring recovery by his parents in this case. The evidence shows that he drove his truck on the main line without stopping and also without looking eastward, and, if he listened, he did not do it in a way which would have enabled him to hear a train coming.

Therefore, plaintiffs' son was also negligent. He did not take nor exercise the proper care and precaution for his own safety at a time and place where he must have known that precaution was necessary, where the danger was, in fact, obvious to him.

Under the law and the evidence, the judgment appealed from was correct.

Judgment affirmed. Plaintiff and appellant to pay the costs in both courts.