## SMITH v. TEXAS & PAC. RY. CO.
### No. 5881.

Court of Appeal of Louisiana. Second Circuit.

March 31, 1939.

Rehearing Denied April 28, 1939.

Wise, Randolph, Rendall & Freyer, of Shreveport, for appellant.

W. Peyton Cunningham, of Natchitoches, and J. S. Pickett, of Many, for appellee.

TALIAFERRO, Judge.

Plaintiff, as he was driving across defendant's track at Thigpen's Crossing in Sabine Parish, at the hour of 9:50 A. M., March 6, 1928, was run into by a west (north) bound passenger train. The truck was demolished. He sustained serious physical injuries, alleged to be permanent, and sues for damages on that account and for the value of the truck. He charges responsibility for the accident to defendant and its train operatives. He alleged upon the following acts of negligence on their part:

Excessive speed of the train; the failure to give warning or signal of its approach by ringing bell, blowing whistle or otherwise; failure to have posted warning or danger signs at the crossing; and the piling of crossties on the right of way in the angle of the cross-road and the track, or causing same to be piled, so as to constitute an obstruction at the crossing.

Defendant denied negligence on its part as a cause or contributing cause of the accident, and specifically avers that it happened solely because of plaintiff's own negligence in these respects: that he approached and drove upon the track without stopping, looking or listening to ascertain the probable approach of trains; in failing to see the approaching train in full view to his right; and in driving upon the track when the train was so close that it could not possibly be stopped before striking him.

In the alternative, these alleged acts of negligence are employed to base a special plea of contributory negligence upon.

The case was brought to trial in June, 1938. It resulted in a judgment for plaintiff for $900. Appeals were granted to both parties.

Defendant's track above and below the crossing for several hundred feet is straight. Plaintiff was driving northerly on a graveled highway which parallels the railway on its west side. He was en route

to contact a squad of road workers at some point east of the track over which he was foreman. He made a right turn onto a dirt (public) road which crosses the track at right angles, and was struck by the train while pursuing this course. It is 63 feet from where this road leaves the graveled highway to the center of the track. The piles of crossties referred to herein were about as high as the average man's head. They were south of the dirt road and not over 12 feet west of the track, and formed to some extent an obstruction to vision down the track to a motorist immediately prior to crossing the track from the west side, as plaintiff was doing when injured.

Plaintiff made the turn onto the dirt road slowly and testified that, observing a bad place in the road, he stopped the truck when its front wheels were at the foot of the incline leading to the track, a distance of some 10 feet. This placed him and truck immediately north of the crossties. He got out of the truck for a brief period and then resumed his seat therein. He looked to his right as best he could over the piles of ties, and saw no train nor did he hear any. The road was wet and slippery. The truck was in low gear. He moved forward very slowly and could not gain a view up the track to his left, due to a nearby cut through which it passed, until his front wheels had gotten over the first or west rail, and, while in this position, for the first time observed the passenger train upon him, so close that he could not avert being hit by it. It was moving at not over 40 miles per hour, which was not excessive. At this speed, however, about 60 feet per second, the train was evidently several hundred feet away when he got back into the truck.

The only testimony in the record which to any extent is contrary to that given by plaintiff, above summarized, is that of the train's fireman. He says that he noticed plaintiff driving up the road at about 15 miles per hour and observed him from that time on until the collision; that he saw him turn slowly into the dirt road, attaining a speed of from 4 to 6 miles per hour, and drive without stopping onto the track. The train then was several hundred yards below the crossing. He assumed that plaintiff would observe the train's presence and stop before trying to cross the track, and was not aware that he did not purpose to do so until the train was within 150 feet of the crossing and plaintiff within 10 feet of the track. He then holloed to the engineer on the opposite side of the cab that "a man was crossing the track". The brakes were instantly applied. The train was not stopped until its rear coach had cleared the crossing. Of the two versions of plaintiff's movements when approaching the track, the trial judge accepted plaintiff's. This version shows that he acted within the law.

Plaintiff is positive he did not hear any whistle of the train nor the ringing of a bell. Defendant's engineer and fireman testified that the usual crossing whistles were blown when the train was in a curve, the north end of which is shown to be about 1800 feet from the crossing. They also say that after the whistling ceased, the bell was set to ringing and continued to ring until after the train had stopped above the crossing. Several witnesses residing on the railway line, within a short distance of the crossing, are positive no whistle was blown prior to the collision and are equally positive that the bell was not ringing, as testified to by the engineer and fireman. The trial judge rejected the trainmen's testimony about the bell ringing, and largely predicated his judgment upon the failure to give proper signals of the train's approach.

We quote from his reasons for judgment:

"The court is satisfied from the evidence that it had been customary for this train which was operated on this date to sound an alarm near the house referred to in the evidence as Mr. Stockton's house, and which was approximately 250 yards southeast of the crossing. All of the witnesses for the plaintiff stated that the train did not sound the alarm by whistle, as had been customary prior to its approach to the crossing, and the court knows of no reason why this was not done on the particular morning of the accident.

"The court is satisfied from the evidence also that the crossties which the defendant placed upon its right of way, or which were allowed by them to be placed upon the right of way for their convenience in loading, constituted an obstruction to the vision of those approaching the crossing to any train that might be approaching from the southeast; especially in view of the fact that only a few hundred yards to the southeast was a cut out of which the train had to come, and especially in view of the fact that there was a depres-

sion in the road at that particular point, created by reason of a washout into which it was intended to place a culvert.

"The defendant's witnesses, the engineer and fireman, both testified that the defendant's train was sounding an alarm by a bell ringing, but all of the evidence of the plaintiff's witnesses was that no bell was ringing or any alarm being sounded, and it is rather strange that one of the plaintiff's witnesses who was riding on the train did not hear the bell sound; neither did one of the defendant's witnesses, Mr. F. M. Williams, who was roadmaster and riding the train on that particular date.

"The fireman and engineer testified that the bell was ringing and those who lived near the track testified that the bell was not ringing. Mr. William Davis, who was riding the train and a disinterested witness, testified that the bell was not ringing and so did the roadmaster, who was defendant's witness and testified he was riding the train and the bell was not ringing, or he did not hear it.

"The court has occasion to observe trains going through the country side and it is not customary to use the bells of the trains to sound warnings, but the whistles of the train are customarily used prior to approaching crossings; the bells usually being used in the towns, villages or cities.

"From a review of all the testimony, the court is satisfied that no alarm was sounded by the defendant train prior to the approach to the crossing, as was required by statute.

"The Appellate Courts have had occasion to pass upon the provisions of Act 12 of 1924, and have held that either the ringing of bells or sounding of whistles at least 300 yards from where the railway crosses any highway or street is in compliance with the statute.

"This Act also requires the placing of signboards at grade crossings on each side of the railroad track and also requires the driver of any motor vehicle to stop not less than ten feet nor more than fifty feet to the nearest track and look for the train.

"The plaintiff said that he made the stop as required by statute, and only one witness denied this and that is the fireman who said he saw the plaintiff approaching 150 feet from the crossing and realized that they were going to strike him. Despite this fact, the defendant sounded no warning of its whistle until it struck the plaintiff and then sounded two short blasts from the whistle and after crossing the grade crossing and stopping, sounded the flagmen's whistle of four blasts."

It is required by Section 1 of Act No. 12 of 1924 that every railway company shall equip each locomotive with a bell of at least 30 pounds weight and a steam whistle which may be distinctly heard at a distance of 300 yards and, "shall cause the bell to be rung or the whistle to be blown at the distance of at least three hundred yards from the place where the railroad crosses over any highway or municipal street, and the bell shall be kept ringing or the whistle shall be kept blowing continuously until said crossing is passed."

It is not a compliance with this law to sound a few blasts of the whistle when the train is over 2000 feet from the crossing. At that distance it is doubtful if the whistle could be heard at the crossing, especially if the wind was unfavorable.

While the Act ordains that the whistle be blown or the bell sounded "at least three hundred yards" from the crossing, which means that this distance is the minimum in which such should be done, it is necessarily implied that to comply with the law the giving of either signal must be at a distance within which it will be effective. Weather conditions and other things should be considered. But the sounding of the bell and/or blowing of the whistle is but the beginning of the duty imposed by this statute. One or the other must continue without cessation until the crossing has been passed. The failure to comply with the law in this respect amounts to negligence of a very gross character, which, we think, was the proximate cause of the accident. If either of said signals had been given as commanded by law, beyond question plaintiff would have heard it and timely stopped the truck. The violation of a safety law is negligence per se. It is only actionable when it constitutes a or the proximate cause of the accident.

Several of the witnesses testified that they heard the noise of the train when it was several hundred feet from them, dependent upon their location at the time, and from this it is argued that plaintiff should also have heard it, even though the signals

were not given as claimed. A passenger train, unless on a grade, does not create a maximum of noise for a train. This particular train was a very short one. When 250 yards below the crossing, it passed through a cut which measurely subdued the sound which would have otherwise emanated from it. In addition to all this, plaintiff was in the cab of his truck, close to the motor, the noise of such, it is well known, goes far toward neutralizing sounds from a distance.

■ It has been held, and correctly so, as contended by appellant, that trainmen are within their rights when they assume that a motorist approaching the railroad track will act sanely and exercise the senses of sight and hearing for his own safety, if for none other. Guillot v. Louisiana Ry. & Nav. Co., 3 La.App. 541, 545; Cook v. L. & N. W. R. Company, 130 La. 917, 58 So. 767; Franklin et al. v. Louisiana & A. Railway Company, 10 La.App. 526, 120 So. 679. But there were present at the crossing involved in this case physical conditions which the trainmen, especially the fireman, the only member of the crew to see plaintiff before the accident, should not have overlooked. While he was at an elevation and could see over the piles of crossties, plaintiff could not do so to advantage because when seated in the car his head was below the top of the ties, which were very close to his right side. The fireman, while contemplating plaintiff's actions as he drew nearer the track, should not have overlooked the possibility that the ties would interfere with his ability to see down the track. Had the whistle been sounded when the fireman discovered plaintiff's perilous movements, three seconds distance away at the rate the train was traveling, this might have served to avert the accident. While plaintiff was ascending the grade to the track, the train evidently covered many times that distance.

■ It has been held and is good law, that, "Railroad permitting erection of structures on right of way near crossing, obstructing view, thereby increasing ordinary risk, must do what is reasonably necessary to offset increased danger." Wyatt et al. v. Yazoo & M. V. Railway Company, 13 La.App. 632, 127 So. 479.

The principle announced in Ross v. Sibley, L. B. & S. Railway Company, 116 La. 789, 41 So. 93, 95, fits the present case very well. The plaintiff therein did not stop, look or listen before attempting to cross over the defendant's track, yet was allowed damages for injuries sustained by him when the train struck him. The court said:

"The mere sounding of the whistle, when the engineer first saw the man would have saved the situation. There was probable danger, and this precaution should have been taken. In another view of the case, if the testimony of Hess be true, and he is a witness for the defendant, the engineer, after seeing the man step on the track, had 15 or 20 feet within which to stop or slacken the speed of the locomotive. The slightest diminution of speed would have prevented the accident.

"We are of the opinion that under the circumstances of this particular case the engineer should have sounded the whistle, or slowed down his train, or both, when he first saw the plaintiff making for the crossing, which was dangerous at all times, owing to the curvature of the track.

"We think the evidence shows that the accident might have been avoided by timely action of the engineer after he saw, or should have seen, the danger of the plaintiff."

■■ Plaintiff asks for substantial increase in the amount of damages awarded him. Appellant does not appear to contest the correctness of the award, if any is due plaintiff, but argues that this court is helpless to accord him relief on this score as he has not appealed nor has he answered the appeal. Appellant is in error. The same order which granted it appeals also granted one to plaintiff and, as he is litigating in forma pauperis, his appeal is perfected simply by the timely filing of the transcript here. Due to three changes of counsel for plaintiff, this case pended in the lower court for nine years. Plaintiff testified as a witness. He was observed by the court. It was definitely determined that he was not affected with permanent disability, due to the injuries received in the accident. The findings of fact by the lower court on the question of injury, their nature and duration, are adopted by us:

"The only evidence introduced on behalf of the plaintiff as to the personal injuries of the plaintiff was that of himself and Dr. R. E. Corkern. Dr. Corkern did not make any examination of

the plaintiff until a few days before trial of this case, which was nine years after the accident, and his evidence was based upon what he found at that time and the history of the case given to him by the plaintiff, being of very little value to the court in determining the amount of injury in this case.

"Defendant's evidence on this line was that of Drs. W. B. Hewitt, H. P. Curtis and McCuller. Immediately after the accident the defendant, through its representative, placed plaintiff upon its train and took him to the Mansfield Sanitarium for treatment.

"He was treated by Drs. Hewitt, McCuller and Curtis, and X-rays were made of his injuries, and from their evidence the injuries consisted of superficial scalp wounds and a small laceration of his gums, which were minor injuries, and a fracture of the pelvic bone.

"The court has the utmost confidence in the integrity of the defendant's doctors and their medical skill in the practice of their profession, and the court has the utmost confidence in the testimony that they gave.

"It appears from their evidence that the plaintiff was brought into the hospital and X-rays made on March 6, 1928, and on April 18, 1928, he was allowed to return home; that he came back and another X-ray was made on June 5, 1928, and the X-ray revealed that the fractured bones were in apposition and that there was no dislocation, and that on June 5, 1928, he was healed of his injuries.

"From this evidence the court is satisfied that the plaintiff was not permanently injured and that he was well at the time the last examination was made of any injuries that he might have sustained by reason of the accident, and if there is any disability at this time by the plaintiff, it is from some other cause, other than the injuries arising from the accident."

Plaintiff claims his truck was worth $500 when demolished. It was three years old. One witness thought it worth not more that $75 at that time. The trial judge fixed the value at $150. We can perceive of no good reason to increase this valuation.

Finding the judgment appealed from correct, it is affirmed, with costs.

HAMITER, J., recused.