The plaintiff brought this suit on her own behalf and in behalf of her three minor children to recover damages in the total sum of $127,640 on account of the death of her husband and father of the minors, resulting from a collision between the automobile in which her husband was riding and a freight train of the Texas 
New Orleans (known as the Southern Pacific) Railroad at a crossing near Schriever. The defendants are the railroad company, J.W. Radcliffe, the engineer of the train, J.K. White, the fireman, and Earl Hudson, the driver of the car in which the deceased was riding. The accident happened just before 1 o'clock in the morning of October 10, 1941, and the train was going north from Houma to Schriever. The car in which the deceased was riding was going east on the paved highway which parallels the main line of the Southern Pacific Railroad running east and west, the highway being south of the main line.
A branch railroad runs from the main line at Schriever to Houma, this branch crossing the paved highway several hundred feet southwest of the station at Schriever. At the point where the railroad track crosses the highway there is a slight curve toward the east in the railroad track coming from the south, so that the track crosses the highway from the south at an angle toward the east. At the southwest corner of the intersection there is a house with a rather thick hedge on the west side of the railroad right of way, this hedge in some places hanging over part of the railroad right of way, thereby obstructing the view to some extent of the operators of the train in seeing approaching cars from the west, and likewise obstructing the view of motorists coming from the west on the highway in seeing a train approaching on the railroad from the south. The usual stop signs were placed by the railroad at the crossing. There were also some tall grass and weeds at the crossing which might have interfered with the vision to some extent.
The deceased, together with Hudson and three other workmen, was returning in Hudson's car from work. Three men riding in the car with Hudson were killed in the accident, and Hudson and the other occupant, Joseph A. Melancon, were injured. Five suits were filed as a result of the accident, but we are only concerned with three which have been appealed to this court: viz, the above entitled suit, and one entitled Mrs. Erita Lee Bryant v. Texas New Orleans R.R. Co. et al., 19 So.2d 898, wherein the widow of another occupant of the car who was killed in the accident filed a suit against the same defendants and made the same allegations of negligence as were made by the surviving widow of Wright. The other suit before us is that of Joseph A. Melancon v. Texas 
N.O.R. Co. et al., 19 So.2d 899, and he makes practically the same charges of negligence against these three defendants as were made in the other two suits, but he did not join Hudson, the driver of the car, in his suit as a defendant.
The cases were consolidated for trial but separate judgments were entered in each case. The trial judge dismissed all three suits as against all defendants and the three plaintiffs in these suits have appealed. What is said here relative to the liability, vel non, of the railroad and the engineer and fireman will apply to all three cases.
The negligence charged to the railroad and the train operatives may be summarized as follows: That the train was being operated at an excessive rate of speed; that the bell was not rung nor the whistle blown continuously on approaching the crossing as required by law; that the headlights on the train were defective; that the engineer and fireman did not keep a proper lookout, and did not have the train under proper control on approaching the crossing under the circumstances existing at the time. The railroad and the two operatives denied the negligence charged to them, and averred that the accident was caused by the excessive rate of speed at which Hudson was driving and his failure to stop, look and listen at the crossing, and that this negligence on the part of Hudson was attributable to all the occupants of the automobile, and as an alternative plea these defendants pleaded contributory negligence on the part of the two deceased, Wright and Bryant, and on the part of plaintiff, Melancon, in that they permitted Hudson to drive at an excessive speed and in allowing and permitting him to enter said crossing without stopping as the law requires.
It is the contention of counsel for these defendants that the evidence fails to show any negligence on their part in any of the *Page 896 
respects charged to them by the plaintiffs. We will discuss briefly the evidence as it relates to the charge of negligence against the railroad, the engineer and the fireman. We might say, however, in the beginning that there is little dispute as to the nature of the crossing, and the fact that Hudson and the occupants of the car were more or less familiar with the crossing as they had passed over it many times in going to and returning from their work. The train struck the automobile on its right side, just in front of the door, and the train continued on three or four car lengths after striking the car. The impact took place near the center or perhaps a little to the north of the center of the pavement on the crossing. The automobile approached the crossing from the west at a speed of 40 to 50 miles per hour and slowed down for the drop in the road at the crossing to a speed estimated from 25 to 35 miles per hour. The automobile came to rest on the east side of the train and the occupants who were killed were thrown in different directions around the crossing.
The decided preponderance of the evidence is to the effect that the speed of the train was not in excess of the maximum limit of 20 miles per hour from Houma to within a quarter of a mile of the crossing when the speed was reduced to 12 or 15 miles per hour. There is nothing to seriously question the testimony of the operatives of the train as to this speed. It is true that the train went some 160 feet after striking the car at the crossing, but the evidence shows that it would take over 200 feet to stop the train going from 12 to 15 miles per hour, and if, as the trainmen testified, the brakes were applied just before reaching the crossing the stop was made within 200 feet or so. We cannot say that a speed of 12 to 15 miles per hour was too fast for the train to approach the crossing, even though the crossing might be classed as dangerous because of the partially obstructed view of approaching traffic on the highway, although this situation did require greater care on the part of the operatives of the train, as well as greater care on the part of motorists on the highway.
On the question of whether or not the whistle was blown or the bell rung for the crossing, Hudson and Melancon testified that they did not hear any whistle or bell as the car in which they were riding approached the crossing; that the car windows were partly down. Another man driving ahead of the Hudson car testified that he did not hear any whistle or bell as he crossed just ahead of the oncoming train. This witness admitted that he was driving pretty fast and just did beat the train across. Against this rather negative testimony, we have the positive testimony of the train crew that the whistle was blown for the crossing and continued to blow until the train almost reached the crossing; that the automatic bell began ringing when the crossing signal was first blown and was kept ringing until after the collision occurred.
The decided preponderance of the evidence is to the effect that the whistle was blown in a series of blasts from the crossing signal post some 1,300 feet south of the crossing until the train was within a few feet of the crossing. While the train crew testified that the automatic bell was rung continuously from the time the crossing signal was blown until the collision occurred, there were several witnesses in addition to Hudson and Melancon who testified that they did not hear any bell ringing. Learned counsel for plaintiffs points to the failure of the train crew to mention the ringing of the bell in their statements before the coroner as weakening their testimony on the trial that the bell was ringing. It is true that in the sworn statements before the coroner shortly after the accident the conductor, engineer, and two brakemen stated that the crossing signal was blown, but made no mention of the ringing of the bell. However, the fireman, whose duty it was to ring the bell, in his statement before the coroner did state that the crossing signal was blown and the bell was ringing on approaching the crossing.
Section 1 of Act No. 12 of 1924 requires railroad companies to equip their locomotives with a bell and whistle which can be heard distinctly for a distance of at least 300 yards, and shall cause the bell to be rung or the whistle to be blown continuously for a distance of at least 300 yards before reaching a road crossing. Conceding that there could be a serious conflict in the testimony as to whether or not the bell was rung for the crossing as required by the above act, we are satisfied that the whistle was blown in substantial compliance with the law. The law does not require both signals to be given at the *Page 897 
same time, either one being sufficient. Banfield v. Louisiana Ry. Nav. Company et al., 18 La.App. 86, 137 So. 571. The sounding of one or two blasts of the whistle for a crossing does not meet the requirement of a continuous signal for a distance of at least 300 yards. Smith v. Texas Pac. Ry. Co., La.App., 189 So. 316. However, as already stated, the preponderance of the evidence in this case shows that the whistle was blown in a continuous series of blasts for more than the required distance before reaching the crossing, which was a compliance with the law.
While Hudson and Melancon, as well as the man in the car ahead of the Hudson car, testified that the headlight on the train was dim and could not be seen for a great distance from the highway, the testimony produced by the railroad and trainmen is overwhelmingly to the effect that the headlight had been tested before the train left Houma and was in good condition. Several witnesses near the scene of the accident saw the light of the train several hundred feet south of the crossing. Of course, the fact that the railroad track crossed the highway at an angle and there was a curve in the track as it approached the crossing caused the light from the locomotive to be deflected from the track and for that reason the beams of the headlight did not strike the highway at right angles. This fact made it more difficult for a motorist approaching on the highway to see the light of the train, or at least to see its full glare. This situation was no fault of the railroad.
On the question of how far a motorist approaching from the west on the highway could see the train coming from the south, the evidence is not quite clear. Neither is it clear as to how far the fireman sitting in the cab of the locomotive on the left side could see or should see an automobile approaching from the west on the highway. Melancon testified that the Hudson car was about 35 feet from the crossing before he saw the front of the train. Hudson did not see the train until it had almost reached the crossing. From an examination of the map and photographs filed in evidence, we see no reason why Hudson could not have seen the train after he passed the point where the hedge obstructed his view which was at least 90 or 100 feet from the crossing. The fireman whose duty it was to watch for traffic approaching from the west testified, on being asked how far he was from the crossing when he first saw the car:
"The front of the engine was about twenty or twenty five feet. I was about forty feet back in the caboose.
"Q. When did you first see the automobile? A. When it came out from behind those hedges.
"Q. How far was that about from the center of the track? A. It was between seventy-five and one hundred feet."
The fireman did not see the beams from the lights on the automobile as it approached on the highway. He states that he hollered to the engineer the moment he saw the car, and the engineer put on the emergency brakes just before the collision. Another witness testified that he saw sand marks on the rails after the collision, which marks went some 33 steps (around 90 feet) down the track from the highway. This would indicate that the brakes were applied about that distance from the highway and the train came to a stop some 160 feet north of the crossing, making a total of about 250 feet the train went after the application of the emergency brakes.
While the testimony of the fireman is not quite clear as to the distance the automobile was from the crossing when he first saw it we think he meant to testify that he saw the automobile when it came from behind the hedge 75 to 100 feet west of the crossing. As it required a distance of over 200 feet to bring the train to a stop, it is obvious that the trainmen did all that could have been done to prevent the collision, unless it can be said that the fireman should have seen the approaching car sooner than he did see it. Conceding that he should have seen this car sooner than he did, he would have had a right to assume that it would stop or at least slow down for the crossing, and there is nothing to indicate that he should have known that this car was not going to stop or slow down in time for the necessary steps to be taken to stop the train and prevent the collision.
We agree with the conclusion of the trial judge that the plaintiffs have failed to prove any negligence on the part of the railroad or the two trainmen made defendants in the suits.
Hudson filed an answer on the day of the trial in the two suits in which he *Page 898 
was made a defendant. He made no objection to going to trial, and he was represented at the trial by one of the attorneys who filed the answer for him. The answers are more or less perfunctory and only make a general denial of all the allegations of the petitions. He filed no plea of contributory negligence against the two deceased, Wright and Bryant. As the plea of contributory negligence is a special plea, it follows that the question of contributory negligence, vel non, on the part of these two deceased has no bearing on the question of the liability of Hudson in these two suits.
There can be no question of the liability of Hudson. He admits his negligence when he says that he did not even look for a train at the crossing and made no effort to stop or slow down at the crossing sign. His gross negligence was the proximate cause of the accident, and we have no other alternative but to render a judgment against him in the two suits in which he was made a defendant.
In the above entitled case of Mrs. Pauline Fulmer Wright for herself and on behalf of her three minor children, it is shown that the surviving widow paid in funeral, hospital and doctor bills a total of $634. Her deceased husband was a young man, thirty-six years of age and earning a very good salary at the time of his death. Under ordinary conditions, the widow and minor children would be entitled to recover substantial damages against Hudson, however, as we said in the recent case of Termini v. Aetna Life Insurance Company et al., 19 So.2d 286, the ability of the defendant to respond in damages should be taken into consideration in fixing the award. It does not appear from the record that the defendant Hudson is a man of any considerable means or large income, nor does it appear that he carried any public liability insurance on his automobile. Taking all these factors into consideration, we have decided to fix the award in favor of the widow at $3,000 plus her actual expenses, and $1,000 to each of the minors.
In the case of Mrs. Pauline Fulmer Wright individually and on behalf of her three minor children v. Texas New Orleans R.R. Co., et al., for the reasons hereinabove assigned, it is ordered that insofar as the judgment appealed from dismissed the suit against the defendants, Texas New Orleans Railroad Company, J.W. Radcliffe and J.K. White, the said judgment is hereby affirmed; insofar as said judgment dismissed the suit against the defendant, Earl Hudson, the said judgment is reversed and set aside, and it is now ordered that there be judgment herein in favor of Mrs. Pauline Fulmer Wright in her own behalf and against said defendant, Earl Hudson, in the full sum of $3,634, and in favor of said plaintiff as tutrix of the minors, Howard L., Teddy Wayne and Gloria Wright, and against said defendant in the further sum of $1,000 for each of said minors, all of said sums to bear interest at the legal rate from judicial demand, and for all cost of the suit.